No. 23278, Vasi v. New York Medical College, et al. Mr. Carhurst, whenever you're ready. Thank you, Your Honor. May it please the Court. In this case, the District Court dismissed the appellant, Dr. Harmiton de Vasi's claims of discrimination and retaliation, as well as claims for breach of contract and tortious interference with contract. This was error. The appellant in this case opposed defendant's summary judgment motions by submitting significant evidence from multiple sources, demonstrating that discrimination or retaliation could be more likely the real reason, and also directly refuted the proffered reason of poor performance. This included the three residents who directly observed that Dr. Vasi was being treated differently when he was being precepted and treated more harshly. Three faculty members, including the former program chair of the Graduate Medical Education Committee, who warned Dr. Harkisoon and the appellees that they were not following the proper procedure, and questioned whether Dr. Vasi was receiving due process. The program's own investigation afterwards of Dr. Harkisoon, which found that she ran the program in a climate of fear and intimidation, punishing people who spoke out. So that may be so. She was definitely a difficult supervisor. What is the evidence that race or religion was a factor? Now, I know there's this, the Patka comment, but in addition to that, what else, what other evidence is there of race or religion? Well, there are at least two comments regarding the Patka. One, the one that Dr. Vasi first learned about was in the second year where the chief resident approached him and advised him he was doing poorly in the program, and as part of that mentioned that the faculty believe that your Patka looks very unprofessional. But later we learned that those comments were going back as early as the first year. Dr. Rock McCall, a former faculty member, was advised and heard Dr. Harkisoon say that Dr. Vasi looked like a thug when he wore the Patka. She raised that at a faculty meeting and said that's inappropriate, and in response, Dr. Harkisoon said, I think what he's wearing is inappropriate, and made the bizarre comment, which McCall says in her declaration, that it can't be discrimination because we're both of Indian descent. The other evidence, Your Honor, regarding that shows discrimination is both, I'd say, directly demonstrating differential treatment as well as pretext evidence. The three residents all observed that Dr. Vasi was being precepted much more harshly than anyone else. Now, the defendants in their- What does that mean, precepted? Precepting, in a residency, the residents have to treat patients. The patients come to the open door medical clinic, and precepting is when the faculty member or the doctor observes the resident treat the patient and will ask them questions. Okay, what are their symptoms? What did you learn? What's your diagnosis? What's your plan of treatment? And the three residents all said that when they were precepted, those were generally the questions that they were asked. Okay, what have you learned? What are you doing? Et cetera, and they would move on. When Dr. Vasi was there, they tried to play stump the resident. They would say, okay, well, if the patient were allergic to this medication, what would you prescribe then? Why didn't you consider prescribing something else? And all three residents- Is there anything to tie? Let's assume he was held to a higher standard. Is there evidence to tie that to a discriminatory or retaliatory reason? Well, I think in addition to the comments about the POTCA, if the individuals- In other words, how do we tie the POTCA comment to the faculty members who were precepting the visits? Well, Your Honor, when witnesses testify that they see an individual being treated differently, it is the promise of the jury then to infer why. Certainly, there are the POTCA comments. And then once you have those, you can determine why was he treated differently throughout the entire process. The residents would not have been permitted to testify. He was discriminated against because of his- And we cite this in our reply brief. This court has said, witnesses can testify, we saw how the supervisor treated him differently, treated him with condescension, treated him unfairly, treated him more harshly. But they would not be allowed to say, and Dr. Hargisoon did that because of her, because of his religion. Well, I agree with that. They wouldn't be able to draw that conclusion themselves. But there still has to be something to show that it is indeed for a discriminatory reason. And what I'm asking is, is there anything other than the two POTCA comments? The two POTCA comments. Well, with respect to when Dr. Bassi raised the issue with his academic advisor, Merritt- Well, he started to argue pretext. So what do you mean by that? Well, pretext in that the proffered reason that he did not meet the milestones is contradicted by virtually every other source of feedback in the program. And one thing which is important to understand in this case is that this is not your typical employment at will case where the supervisor or manager has the authority for any reason and can get rid of them. But under the testimony of Dr. Hargisoon herself, she acknowledged that the clinical competency committee that ultimately decides whether to advance the resident is supposed to take feedback from all sources. And in this case, all of the sources, the rotation evaluations, the on-call hospitalists- The clinical part is important, obviously, and he had continued deficient reviews in the clinical areas from, as far as I can tell, from early on, before, and after the comments that you were just talking about. Well, the question is, and then the question is, is that feedback authentic academic judgment or was it because of the bias regarding his POTCA and then afterwards when he complained? I would note that two of the residents who submitted declarations also preset the Dr. Bossie himself because when they were his seniors, senior residents will preset the junior residents, and they both gave good feedback. As we cite in our brief, anyone other than the core faculty, and in this case, the core they were the ones that kept giving negative feedback, but everyone who was not core faculty repeatedly said, he's doing fine. The two residents said that. Dr. Johnny Kavor, they designed a rotation for Dr. Bossie to allow him to do what was essentially the clinical work that he was doing on a daily basis. There were so many of these deficient reviews made by many different doctors. Were they all tainted? Is there evidence that they were all tainted? It was the core faculty. How many members on the core faculty? I believe it's between six and eight. The composition changed slightly throughout the program, but it was the same doctors. Again, the fact that they keep writing down negative evaluations doesn't make these any more credible. It's their judgment that's at issue. What I would note is that- On the other side of that, you have, I think there were two comments about the PACA. Is that all you have? Well, no. We also have the testimony of differential treatment that the residents saw. We had Dr.- I guess I'm going back to Dr. Chin's original question, which is what's the connection to race and religion? I'm hearing you to be saying that because the PACA is a Sikh garment, we should infer from that that it's both race and religious discrimination that's going on. Yeah. That goes to ethno-religion. Sikhism is a religion, but it also originates from a particular region, the Punjab region in India. But, yeah, certainly comments as early as the first year that he looked like a thug. And when the comment was relayed to him by the chief resident, it was explicitly in the context of you're not doing well in this program. The core faculty do not think you're doing well. And it specifically raised the PACA in response to that. But what I would note is that the plaintiff can still prove indirectly through pretext or through- Is that enough by itself? I mean, what if it was a white resident with a bandana and it was the same comments? It could be. And that's a question for the jury to ultimately decide. But if you have at least two comments explicitly tying religious headwear to performance and professionalism, the jury is permitted to make the inference. The case can't be decided on summary judgment. Finally, I would also note that the fact that the program- That Dr. Harkison's program kept trying to expel Dr. Bossie despite the decisions of the appeals committee, particularly the 2017 decision, which rejected their assessment in its entirety. And they nevertheless reinstated him, said he has to take the PGY-2 year for a third year in a row. And that provided them with even more punitive measures than he received after the 2016 appeal. And remember, in the 2016 appeal, the committee said you can't terminate him, but you can make him repeat PGY-2 with credit for what he has successfully completed. Dr. Bossie then went back and the rotations he took were third year rotations because he passed all of them, except for one where he didn't do enough gynecology sessions because of a schedule conflict. And yet when the second decision comes around, the appeals committee this time says he's addressed all the issues, he should be allowed to finish his training and complete the outstanding rotations. And the program ignores that and gives him an even more punitive reassignment than they did when the appeals committee upheld their judgment that he should not be promoted to PGY-3. I see that my time is up. I'm happy to answer questions. Otherwise, I have four minutes for rebuttal. We'll reserve some time for rebuttal. Thank you, counsel. Ms. Passarelli? Good morning and thank you. May it please the court, this is Mariah Passarelli on behalf of New York Medical College. At the risk of immediately abandoning my prepared remarks, I want to point something out based on Mr. Parkhurst's arguments a moment ago. You know, New York Medical College, from the inception of this case, has repeatedly made the point that we didn't employ any of the alleged bad actors. We weren't a party to any contract. Can I ask a question about that? Yes. I understand there's not a salary, but in academia there are faculty appointments that create a faculty relationship. I understood that New York Medical College appointed Dr. Harkison as residency director and that that was its province to appoint her. Am I mistaken about that? In part. So the affiliation agreement, which was tripartite between Opendoor, Phelps, and NYMC, created the program and the program, by virtue of all three of those parties, appointed Dr. Harkison. But Dr. Harkison was employed only by the program, only by Phelps within the program. When the program was established, I think NYMC played a role in appointing her. I looked at the program agreement. It says the parties agree that the program director for the program will be appointed by the dean of the School of Medicine of NYMC and shall report to the designated institutional office of NYMC, the chair of the Department of Family and Community Medicine of NYMC, and the chief medical officer of Phelps. Only with regard to NYMC's very, very limited role, which was to ensure accreditation compliance within the program. Okay, but my narrow question was, am I correct in understanding that New York Medical College appointed Dr. Harkison? Yes. And am I correct in understanding that when we talk about faculty, core faculty, they're faculty of something. Is there faculty appointment of the core faculty, a faculty appointment at NYMC? There, on a limited basis, may be situations where a core faculty within the program, a core faculty member, may have a dual teaching appointment. But during the period of time of this case, there were no individuals that were a core faculty member within the program. So faculty, for purposes of our discussion, means a core faculty member in this medical residency program, not a core faculty member at NYMC. So they don't have a teaching appointment? They may have had a dual appointment on paper. They were not teaching at NYMC. Okay, I'm talking about paper. Yes. So on paper. There may have been a dual appointment as faculty for NYMC. There may have been or there was. That was built into the program that when we call them core faculty, it means they had a dual appointment at NYMC. It is not built into the program. It would be by happenstance. That one of the individuals who happened to be on core faculty within the program happened also to have a dual teaching appointment. But during the period of time relevant to Dr. Bozzi, I'm not aware of a core faculty member within the program also actively teaching at NYMC, notwithstanding a dual appointment. What was the name of the program? Family Medical Residency Program. No, it was the NYMC Phelps Family Medicine Residency Program, wasn't it? Yes. And was it NYMC Phelps? Doesn't that suggest that it's at least in part an NYMC residency program? It might have if you didn't read the affiliation agreement. And even if you move beyond the affiliation agreement and start talking about the actual contracts at issue, which are residency agreements between Dr. Bozzi and the program, those residency agreements are executed only by individuals from Phelps. It's important to understand that the NYMC Phelps Medical Residency Program is a non-existent legal entity. It doesn't exist legally. Right. No, I understand that, which is why we're trying to unpack who the real legal actors are that might be potentially liable. But when you say it was only signed by the program, since the program doesn't legally exist, we have to look behind that. And there were two signatories to the residency agreement. Yes. One of them was clearly Phelps. Yes. All right? Now, it says NYMC Phelps Residency Agreement, and then there's a second person who signed who is the director of the program who's been appointed by NYMC. How can we infer that that agreement really is only with Phelps? Because when an individual human being signs on behalf of a non-existent legal entity, so if we accept that NYMC Phelps Family Medical Residency Program is a non-existent legal entity, and it is, when Dr. Harkison signs that agreement, because she's signing on behalf of a non-existent legal entity, the liability becomes Dr. Harkison's. It can't become NYMC's reaching through a non-existent legal entity. And the case that supports that is Sutton v. Halu, which is a New York appellate division case from 2021, and it's cited in our brief. In that situation, very similarly, two individuals signed an agreement on behalf of a non-existent legal entity. They testified in that case that they intended to form an LLC but never did. In subsequent litigation between those two individuals on behalf of their non-existent legal entity and another company from whom they were claiming a right to distribution, the company who was a co-signatory to that agreement tried to argue that the agreement in its entirety should be set aside because those individuals signed it on behalf of a non-existent legal entity. And in deciding that those two individual humans that signed that agreement had standing to bring a lawsuit for distribution, the court in Sutton held that when an individual signs an agreement in the state of New York on behalf of a non-existent legal entity, the agreement itself and its obligations don't go away, but instead it's- Isn't there evidence in the record that NYMC was involved in the process? No. The hiring process, they helped prepare guidelines for the appeals committee, they engaged in communications with the appeals committee. There is evidence in the record that NYMC met its obligations to establish the program, that as part of that, they appointed Dr. Harkinson to direct the program. But if you look at the evidence that relates to- Why isn't that enough for this to be put to the jury, this issue? Because a moment ago we heard Mr. Parkhurst list the following people. Harkinson, the chief resident, residents, academic advisors, the CCC, hospitalists, specialists, core faculty, Dr. Kavor, and the appeals committee. None of those individuals were employed by, supervised by, or reporting to from a day-to-day running the program perspective. Anybody at NYMC. And this is all to ignore, I have an obligation to raise before my time is up, that our position is that Dr. Abbasi waived his claims against NYMC or abandoned them by not addressing them in his response to our motion for summary judgment or by not addressing them on appeal. The only thing Dr. Abbasi raises on appeal is that factual evidence wasn't considered by the lower court. In 17 pages, 16 pages of his appellate brief regarding that factual evidence, there are four mentions of NYMC, and none of those mentions have anything to do with NYMC taking an adverse employment action. They don't rebut our contention that NYMC is not an employer, and as a result 1981, Title VII, and New York State human rights law liability can't attach. They don't address the notion that Dr. Harkinson, when she signed that agreement, did not make NYMC a party, but if anything, made Dr. Harkinson as an individual signing on behalf of a non-existent legal entity a party, none of those things are addressed in Dr. Abbasi's appellate brief. The mentions of NYMC are that NYMC established the program with Phelps and Open Door, that Northwell assumed NYMC's duties in 2017, critically I might add on that point prior to Dr. Abbasi being dismissed from the program, that at some point in 2015 or 16, Dr. Abbasi and a group of other folks went to an NYMC employee, McCarrick, to complain about things, but when McCarrick said he couldn't promise them anonymity, they made no substantive complaints, and then at some point Dr. McCarrick became aware that the program was videotaping Dr. Abbasi's interactions when he was being precepted, which it did for all residents. Those are the only mentions of NYMC in 16 pages of the appellate brief. There is no counter-argument made by Dr. Abbasi in his appeal to any of NYMC's substantive legal arguments in favor of summary judgment, and as a result, those arguments are waived. So even if we, you know, our position is, as set forth in our motion for summary judgment, that Dr. Abbasi has failed as a matter of law, that there is no material dispute of fact that could cause NYMC to lose summary judgment, but even if you disagree, Dr. Abbasi abandoned those arguments when he failed to address them in response to our summary judgments and then failed again to address them in his initial appellate brief. And for the reasons set forth in the case law in our brief, we think the law is pretty clear about abandonment and waiver on those points. Thank you, Counsel. Mr. Kyle. Thank you, Your Honor, and may it please the Court, John Kyle on behalf of Phelps, Northwell, and Dr. Harkison. I want to start by addressing a couple of things that Mr. Parker said where he misstated the record. There were no comments relating to Dr. Abbasi's potka in the context of his performance. The record simply does not support that claim. And to the extent that Dr. Harkison is accused of making comments, she did not evaluate Dr. Abbasi's performance at all in the final year and a half of his residency program. All of the other evaluations were conducted by other faculty members, other members of Open Door or Phelps, against whom Dr. Abbasi has alleged nothing regarding discrimination. If I understand plaintiff's theory of the case, first of all, we're talking about comments. I think I understand the theory to be a little bit more than there were a couple of straight comments along the way. The comments caused us to believe that the core faculty not identified which individuals had a collective concern about his wearing this religious garb that was significant enough that they sent residents to go talk to him about it, and that they then came to learn that the director of the program had held the view that he looked like a thug from essentially close to the inception of the program. So it's not simply, oh, I had a couple of comments, that must be the reason. Then I understand the theory to be that the director who held these views from the inception was very overbearing and was known to have disproportionate influence with the core faculty members, which would explain why someone like the doctor who's not the core faculty member who had a similar rotation for clinical experience- You're referring to Dr. Gavur? Yeah, gave rave reviews because he's not within the program. Why isn't that enough to get to the jury and put aside whether they're right or not? Well, Your Honor, first of all, with regard to the accusation of Dr. Harkison being overbearing, that was not something that Northwell was able to substantiate. There was a complaint made against her three years after Dr. Bossi left the program, which Northwell investigated and found to be unsubstantiated. There's nothing connecting Dr. Harkison's conduct to suggesting anything improper towards Dr. Bossi. To the contrary, she- Wasn't there a member of the core faculty who herself ended up leaving in part because of this dynamic? That is- Dr. Cowell makes that claim. She left very early in Dr. Bossi's residency, maybe a year in. To my knowledge, she did not conduct any evaluations of Dr. Bossi's performance. No, no, but I think she talked about- the evidence that she brought to bear was less about his performance and more about the dynamic in the program in which he was being unfairly singled out. Well, her comments, if they are to be credited, they only speak to Dr. Harkison. They do not speak to Dr. Collins, Dr. McHatter, Dr. Mews, Dr. Rye, Dr. Paul, all these people who worked closely with Dr. Bossi on a daily basis and wrote detailed evaluations with particular patient encounters, talking about how he could not properly evaluate, document, or treat these patients, and their conclusion was that he could not safely or independently provide patient care. So they provided him with maximum resources, lots of coaching. Dr. Kavor said he needs lots of coaching, lots of feedback. They gave him that, and now he's being held to a different standard. But if part of the theory of the case, and if there's evidence to support it, is that those individuals were within this universe of people who bore the improper animus, right? And we know that the complaint about wearing the pocket that was relayed through the chief residence came from at least some members of that core faculty, and we have reason to believe there was discussion among them about his wearing the religious garb. If that's the theory of the case and there's some evidence to support it, then how can you rely on those same evaluations to overcome the pretext argument? Well, I'm out of time, Your Honor, but if I may answer, the comment was attributed to Dr. Waldman, who is not part of the core faculty, and there's no evidence that anyone on the core faculty discussed those comments or discussed his complaint. There's simply nothing in the record to suggest that. The record shows, to the extent there's an accusation, the accusation is only against Dr. Harkison. Isn't there a comment that the faculty, plural, believed the pocket was unprofessional? My understanding is Dr. Waldman told this to Dr. Harkison, who thought that Dr. Bosco would want to know the comment had been made and had the chief residence convey that, but I don't know what the chief residence said. There was evidence that it wasn't just one person thinking it was unprofessional. There was evidence that multiple people thought it looked unprofessional. Whether it's true or not, I mean, the question, there is some evidence to that effect. Dr. Bosco claims he was told that. I agree. He claims he was told that. We accept that as true at this point, don't we? But there's no evidence for any of those. And also, I mean, we also cited a case law in our brief, Your Honor, when there's a committee decision, if an accusation is leveled against one member of the committee, that is not attributed to the rest of the committee without some kind of evidence tying this. That's my point. It's not attributed to one member. It was attributed to the faculty, plural. Well, an unnamed member, Your Honor, and the core faculty changed over time. Thank you, Counsel. Thank you. Ms. Sethi. Good morning. May it please the court, my name is Poonam Sethi and I represent Appellant Open Door Family Medical Center. Before I begin my arguments, I'd like to clarify a few things for the record as well. Your Honor's question about identifying specialists. In the record, it was a comment that was testified to by Dr. Harkisun and Dr. Pathyadam. Both of them referenced a hospital specialist and not an open door core faculty member. That can be seen on the joint appendix on page 1422. There is no evidence identifying any of the discriminatory or allegedly discriminatory comments relating to the podcast by any core faculty member employed by Open Door. Do we have evidence? I mean, it's sort of a big deal to send a chief resident to convey this message. And if it's an improper message to convey and that's understood, probably people in authority would not, even if it was some random Joe on the street who made this comment, they wouldn't convey it. Do we have an understanding of who sent the residents to communicate this concern on the part of the faculty about the religious guard? Well, that was by the program director, Dr. Harkisun, who is not an open door employee. She is employed by Phelps, by co-appellant. And so Open Door was not aware of the alleged comment by the hospital specialist, so someone who's not in their employee until Dr. Bassi made the complaint on January 21st, 2021. And prior to that, Open Door had no knowledge. There's no allegations that any Open Door core faculty member was aware of the comment, made the comment until Dr. Bassi's complaint. When you say core faculty member, I'm curious. I talked about this with your colleague. Is that a faculty appointment with NYMC? Is that a sort of, what does it mean to be a core faculty member? So core faculty members are responsible for patient care and teaching within the family medical center. But what faculty, what, are they associated with an educational institution or can you just be fair? They are employed by Open Door. Right. The core faculty. But their faculty appointment, that comes from Open Door? Well, to work in the family door medical center clinic, whether they have appointments at the hospital or other entities through those entities. With respect to appellant's argument, he groups all of the appellants together. First and foremost, there are no claims for breach of contract or torturous interference claim against Open Door. And second of all, the performance issues that appellant's counsel referenced are relating to the podcast. Dr. Bassi had performance issues that predated him even wearing the podcast. He never wore the podcast while he was at the clinic at Open Door facility. He started receiving negative reviews in October of his first year residency. He has various negative evaluations by multiple evaluators, including Dr. Call, Dr. Collins, Dr. Cuthiata, Dr. Paul, Dr. Muse, Dr. Wu, Dr. McAteer, and appellant. When did the podcast comment, when was that made in relation, you said the negative review started in October of year one. Correct. And so in relation to that, when was the podcast comment? So the alleged comment by Dr. Hargisoon making the thug comment hasn't been clarified. It's essentially hearsay. When? My question is when. It's sometime in the first year, but there is no clarity as to when. Well, that's before you said it was after, and that's what I'm asking. How far? Well, his complaint was in January 21st, 2016. And that was regarding the hospital specialist making, by Dr. Waldman making the comment that he, that the appearance of wearing the podcast appeared to be unprofessional. And that was in year two. Have you learned in year two about the comment that had occurred sometime in year one? Those are two different things. They're two separate things. So the first comment about the thug came through in discovery, but he was made aware of the comment where a hospitalist, which was allegedly Dr. Waldman, made a comment saying that the wearing of the podcast appeared to be unprofessional. And Dr. Bassi testified that he only wore the podcast, which is basically a type of, it's a smaller type of headwear underneath his turban. And he wore it on overnight shifts or when he was on the gynecology rotation or in surgical rotation. So where do I find in the record, I'm interested in your point that he didn't wear this in the context of his clinical rotations and their clinical service in the open door clinic. Did he never wear it in the open door clinic? No, he testified that he did not wear it while he was at the open door clinic. I'm out of time, but I would just like to make my. Thank you. We request that the court uphold the district court's decision that was based on a careful review of facts that found a lack of discriminatory retaliatory motive on behalf of open door. Thank you. Thank you. We'll hear about it. Thank you. Just on the timing point, the suggestion is that the negative evaluation started before the podcast comment. Well, yes, to the extent that the core faculty at least twice expressed concerns that he looked unprofessional in his podcast like a thug. It could very well be that when they were evaluating him, their discrimination against him did not start when they made the comment. Rather, that comment is an expression as to how they were viewing his performance and whether it was tainted by bias. I would like to address this point that a hospitalist made the comment. The defendants did not submit a declaration from the hospitalist saying it was me, and there's good reason to doubt Dr. Harkison. First, Dr. Call said that as early as first year, it was Dr. Harkison who was making those comments. I would also note that at her deposition, Dr. Harkison, when asked about Dr. Call, said Dr. Call had grave concerns about Dr. Bossi his first year. Dr. Call has submitted a declaration saying that's absolutely incorrect. She submitted as well an email to Dr. Harkison pointing out he's on level with everyone else. And Dr. Harkison admits in that email, you've seen him more than anyone else. We haven't really precepted him. So the defendant's now coming back and saying, oh, we knew that he was doing poorly as early as first year, and yet Dr. Harkison solicited feedback from the one faculty member who interacted most with him, and she said he's on level. He's doing a good job. So we have a lot of evidence pointing to Dr. Harkison going back to day one. We're struggling, I think, with this idea of, okay, there were these negative evaluations from a lot of other members of core faculty. Now, you heard me characterize what I understood to be your theory of the case. Can you tell me the three pieces of evidence that are most compelling in supporting the theory that Dr. Harkison's animus infected the rest of these folks who were giving the negative evaluations? Well, I would go to the Call declaration first, because she learned of the first POTCA comment from another core faculty member who was saying that she thinks it's inappropriate. And in addition, in that affidavit, Call points out she visited and was speaking with one of the faculty members. I believe it was either Collins or Andron. And they said as early as second year, yeah, we're trying to get rid of him. And Dr. Call retorted, saying, he's a good resident. I don't know what you're talking about. But it's clear that the core faculty were all working under Dr. Harkison. You see the email discussions trying to determine how much credit he should receive. And one of them said, well, he passed the rotations. We have to give him some credit. But they all agreed with Harkison to strip him of almost all his second year credit, even though they're not authorized to do that. It goes to show, they're out to get him. I'm still trying to figure out, we're trying to tie it to the religious-based animus. And let's assume we accept that there's a sufficient evidence that Dr. Harkison bore that animus. I'm trying to figure out where the evidence is that the others who did these negative- Sure. Well, like I said, first, the call affidavit. I would say, secondly, the report that was prepared by Phelps afterwards, when they placed Harkison on the PIP. The idea being that if Dr. Harkison was overbearing a few years later, she probably was overbearing at the time. Yeah, and that's afforded treatment under Sprint versus Mendelsohn, where the evidence we weighed probative value versus prejudicial effect. But one point I'd like to get to, though, because we've been told that no one else knew of the comments or the complaint. Dr. Bossie complained directly to his academic advisor and said he was filing the complaint. That's Dr. Puthiyamadon. And she said, you made things worse for yourself. And she did not deny that at her deposition. In addition, the record shows that it was discussed in a review with Dr. Paul and Dr. Andron that Dr. Bossie felt that his complaint was being held against him. And Dr. Andron responded saying, well, you can go to HR or learn how to deal with your anger and resentment. Dr. McCarrick testified that they videotaped Dr. Bossie because he filed a complaint and wanted to obtain consensus on his poor performance. And Dr. Harkison emailed everyone saying, I'm not going to precept Dr. Bossie because I've been accused of prejudice. Although, as we cite in our reply brief, she, in fact, did have precepting sessions with Dr. Bossie after he brought the complaint. I'm out of time again. If there are any questions otherwise, thank you very much. Thank you, counsel. Thank you all. We'll take the case under advisement.